U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

SEP 1 4 2016

TONY R. MOORE, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 06:16-CR-00048 |
| | * | 18 U.S.C. § 241 |
| | * | 18 U.S.C. § 242 |
| VERSUS | * | 18 U.S.C. § 371 |
| | * | |
| LOUIS ACKAL        (01) | * | JUDGE WALTER |
| GERALD SAVOY   (02) | * | MAGISTRATE JUDGE HANNA |
| MARK FREDERICK (03) | * | |

## SECOND SUPERSEDING INDICTMENT

**THE FEDERAL GRAND JURY CHARGES:**

### INTRODUCTION

1. At all times relevant to this indictment, the Iberia Parish Sheriff's Office ("IPSO") was a law enforcement agency that staffed both the Sheriff's Office and the Iberia Parish Jail ("IPJ") in New Iberia, Louisiana.

2. Within the Sheriff's Office were several specialized units including, but not limited to, the Narcotics Unit, K-9 Unit, the SWAT team, IMPACT and Internal Affairs.

3. The Narcotics Unit was a group of specially-trained officers, led by a Lieutenant and a Sergeant. In addition to conducting drug enforcement in New

Iberia, the Narcotics Unit was occasionally called to the jail to assist in conducting shakedowns of the facility.

4. The IPJ housed state and federal pre-trial detainees and inmates convicted of state crimes. The jail included, among other facilities, pods that housed inmates; control booths from which the pods were monitored; and a chapel that was not covered by the jail's video-surveillance system.

5. From on or about July 2008 to on or about March 2016, defendant **LOUIS ACKAL** was the Sheriff in charge of both the IPSO and the IPJ.

6. From on or about July 2008 to on or about March 2016, defendant **GERALD SAVOY** served on the Narcotics Unit and then as a Supervisor at IPSO.

7. Between July 2008 and sometime in 2015, the following individuals were members of the Narcotics Unit: Wade Bergeron, Bret Broussard, Jason Comeaux, David Hines and Byron Benjamin Lassalle.

8. On April 29, 2011, there was a shakedown at the IPJ. On that date, Wesley Hayes was the Warden at IPJ, and requested assistance from IPSO during the shakedown of the jail.

9. As a result of Warden Hayes' call for assistance, **ACKAL** and **SAVOY**, along with members of the K-9 unit, the SWAT team, the Narcotics Unit, and the IMPACT unit, responded to IPJ to assist.

10. On April 29, 2011, C.O., S.S., A.T., A.D., and H.G., individuals mentioned in Counts 1, 2, 3, and 4, were pre-trial detainees housed at the IPJ.

11.  On March 14, 2014, R.T., an individual mentioned in Count 4, was a person who had been accused of assaulting a relative of **ACKAL'S**.

12.  Paragraphs 1-11 are hereby incorporated into each of the Counts set forth below.

## COUNT 1

### CONSPIRACY AGAINST RIGHTS
### 18 U.S.C. § 241

On or about April 29, 2011, in the Western District of Louisiana, defendants

**LOUIS ACKAL and**
**GERALD SAVOY**

willfully combined, conspired, and agreed with one another, and with Wesley Hayes, Jason Comeaux, Byron Benjamin Lassalle, and other persons known and unknown to the grand jury, to injure, oppress, threaten, and intimidate inmates and pre-trial detainees, including C.O., S.S., A.T., A.D., and H.G., in the free exercise and enjoyment of the right, secured and protected by the Constitution and laws of the United States, not to be deprived of liberty without due process of law, which includes the right to be free from the use of excessive force amounting to punishment by a law enforcement officer.

### PLAN AND PURPOSE OF THE CONSPIRACY

1. It was the plan and purpose of the conspiracy that IPSO officers and supervisors would punish and retaliate against inmates and pre-trial detainees by taking them to the chapel of the IPJ, where there were no video surveillance cameras, to unlawfully assault them. It was further part of the agreement that the officers and supervisors who witnessed these unlawful assaults would not intervene to stop them.

4

## OVERT ACTS

2. In furtherance of the conspiracy, and to effect the object thereof, the defendants and their co-conspirators committed the following overt acts, among others, at the IPJ, in the Western District of Louisiana:

a. In response to a lewd comment made by a detainee on the recreation yard in the IPJ, **ACKAL,** in the presence of **SAVOY**, told Lassalle to take care of the detainee.

b. Understanding that **ACKAL** wanted him to assault the detainee to retaliate against him for the lewd comment, Lassalle, in the presence of **ACKAL** and **SAVOY**, asked Hayes where there was a place at the jail without cameras, and Hayes responded, "the chapel."

c. Lassalle, Hayes, and other officers then took C.O. to the chapel, where C.O. was hit multiple times with a baton while C.O. was compliant and not posing a threat to anyone. No officer in the chapel stopped the unlawful assault on C.O.

d. C.O. eventually blamed another detainee for having made the lewd recreation yard comments. In response, Lassalle escorted that detainee, S.S., to the chapel so that he could be assaulted in retaliation for the lewd comment.

e. Inside the chapel, numerous officers watched as S.S. was assaulted with a baton while S.S. was compliant, kneeling on the floor, and not posing a threat to anyone.

  f. Upon learning that S.S. was in jail for a sex offense, Lassalle took his baton, held it between his own legs as if it were a penis, and forced it into S.S.'s mouth, causing S.S. to choke. No officer in the chapel stopped the unlawful assault on S.S.

  g. When S.S. eventually blamed a third detainee for the lewd comments, officers escorted that detainee, A.T., to the chapel, so that he could be assaulted in retaliation for the lewd comment.

  h. In the chapel, A.T. was assaulted with a baton while A.T. was compliant and not posing a threat to anyone. No officer in the chapel stopped the unlawful assault on A.T.

  i. At another point during the shakedown, **ACKAL** encountered H.G. and learned that H.G. had written letters complaining of the conditions at IPJ. **ACKAL** told an officer to take H.G. to the chapel.

  j. Understanding that **ACKAL** wanted H.G. to be assaulted, the officer escorted H.G. to the chapel.

  k. **ACKAL** also encountered A.D., a pre-trial detainee known to **ACKAL**, and told Comeaux to take care of A.D.

  l. Understanding that **ACKAL** wanted him to use force to punish A.D., Comeaux took A.D. to the chapel so that he could be assaulted.

6

m. In the chapel, **ACKAL, SAVOY**, and others watched as officers beat A.D. with batons while A.D. was compliant, surrounded by officers, and not posing a threat to anyone. No official in the chapel stopped the unjustified abuse of A.D. While A.D. was being beaten, another officer struck H.G., who was also in the chapel, while H.G. was compliant and not posing a threat to anyone. During the assaults, **SAVOY** ordered a K-9 handler to make his dog bark, in order to intimidate detainees A.D. and H.G.

All in violation of Title 18, United States Code, Section 241. [18 U.S.C. § 241].

7

## COUNT 2

### DEPRIVATION OF RIGHTS
### 18 U.S.C. § 242

The Grand Jury for the Western District of Louisiana further charges:

1. Introductory paragraphs 1 – 11 of this Indictment are realleged and incorporated by reference herein.

2. On or about April 29, 2011, at the IPJ, in the Western District of Louisiana, defendant

**LOUIS ACKAL**,

while acting under color of law and while aiding and abetting others known and unknown to the grand jury, willfully deprived C.O., a pre-trial detainee, of the right, protected and secured by the Constitution and laws of the United States, not to be deprived of liberty without due process of law, which includes the right to be free from excessive force amounting to punishment by a law enforcement officer. Specifically, defendant **ACKAL** encouraged and directed another officer to assault C.O., and that officer, aided and abetted by others, then carried out an unjustified assault. The offense resulted in bodily injury to C.O. and involved the use of a dangerous weapon (a baton).

All in violation of Title 18, United States Code, Sections 242 and 2. [18 U.S.C. §§ 242 and 2].

8

## COUNT 3

### DEPRIVATION OF RIGHTS
### 18 U.S.C. § 242

The Grand Jury for the Western District of Louisiana further charges:

1. Introductory paragraphs 1 – 11 of this Indictment are realleged and incorporated by reference herein.

2. On or about April 29, 2011, at the IPJ, in the Western District of Louisiana, defendants

**LOUIS ACKAL and
GERALD SAVOY,**

while acting under color of law and while aiding and abetting each other and others known and unknown to the grand jury, willfully deprived A.D., a pre-trial detainee, of the right, protected and secured by the Constitution and laws of the United States, not to be deprived of liberty without due process of law, which includes the right to be free from excessive force amounting to punishment by a law enforcement officer. Specifically, **ACKAL** encouraged and directed another officer to assault A.D. and then, as the assault was being carried out in the chapel of the IPJ, **ACKAL** and **SAVOY** chose not to intervene, despite having the opportunity to do so and knowing they had a duty to do so. The offense resulted in bodily injury to A.D. and involved the use of a dangerous weapon (a baton).

All in violation of Title 18, United States Code, Sections 242 and 2. [18 U.S.C. §§ 242 and 2].

9

## COUNT 4

### CONSPIRACY TO ABUSE AND OBSTRUCT
### 18 U.S.C. § 371

1. Introductory paragraphs 1 – 11 of this Indictment are realleged and incorporated by reference herein.

### THE CHARGE

2. From on or about July 2008 until on or about March 2016, in the Western District of Louisiana, defendants

**LOUIS ACKAL and
GERALD SAVOY**

willfully combined, conspired, and agreed with one another, and with Wade Bergeron, Bret Broussard, Jason Comeaux, David Hines, Byron Benjamin Lassalle, and other persons known and unknown to the grand jury, to commit the following offenses against the United States:

   a. to act under color of law to willfully deprive people in the custody and control of the IPSO of the right, protected and secured by the Constitution and laws of the United States, to be free from unreasonable seizure, which includes the right to be free from the use of unreasonable force by a law enforcement officer, in violation of Title 18, United States Code, Section 242; and

   b. to knowingly engage in misleading conduct toward other people and to knowingly corruptly persuade other people, with the intent to hinder, delay, and prevent the communication to a federal law enforcement officer and

10

federal judge of information relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(b)(3); and

c. to knowingly destroy, falsify, and make a false entry in a document with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within federal jurisdiction, and in relation to and in contemplation of such a matter, in violation of Title 18, United States Code, Section 1519.

## PLAN AND PURPOSE OF THE CONSPIRACY

3.  It was the plan and purpose of the conspiracy that IPSO officers and supervisors would use force to punish and retaliate against people in the custody and control of IPSO. It was further part of the agreement that the officers and supervisors would conceal the unlawful uses of force by providing false and misleading statements when asked about the uses of force, and covering up other information to ensure that IPSO and the officers involved in the assaults would be shielded from liability. It was further the plan and purpose of the conspiracy that officers would not write use of force reports or would write false and misleading reports to cover up their unlawful uses of force, and that supervisors would overlook illegal uses of force.

11

## OVERT ACTS

4. In furtherance of the conspiracy, and to effect the objects thereof, the defendants and their co-conspirators committed the following overt acts, among others, in the Western District of Louisiana:

a. On several occasions, from in and around July 2008, until in and around November 2008, **ACKAL** instructed IPSO employees and supervisors during various staff meetings that if someone sassed them, or spit on them, the officers should, "work [the person] over." IPSO employees understood **ACKAL** to mean that they should rough people up by using more force than necessary.

b. **ACKAL** further directed IPSO employees and supervisors during various staff meetings that if they "worked over" a person, they should charge the person with resisting arrest. **ACKAL** instructed senior IPSO officials involved in Internal Affairs (IA) that, if a use of force complaint came in and the paperwork indicated that the subject "resisted arrest," the IA official should find the complaint unfounded.

c. **ACKAL** told IPSO commanders and supervisors not to worry about use of force complaints, because **ACKAL** would "take care of" IA.

d. When IPSO IA officials and employees complained to **ACKAL** that officers in the Narcotics Unit were using excessive force, **ACKAL** told the IA officials that the Narcotics Unit was "kicking ass and taking names," and doing

12

what they had been told to do. **ACKAL** told the IA officials that they were doing too much and that they should lay off the Narcotics Unit.

    e.    On November 2, 2008, three Narcotics Agents got drunk off-duty and decided they wanted to beat someone up. The three Agents encountered two African-American males and assaulted them.

    f.    When IPSO patrol officers responded to the assault, two of the three agents were found on or near the scene. The two agents who got caught lied, denied assaulting the two young men, and claimed that they had been conducting legitimate police surveillance. One of the responding IPSO officers wrote a report documenting the agents' accounts, and finding the accounts suspicious, named the agents as suspects in the reported assaults.

    g.    The following day, the three agents, together with a Narcotics supervisor and other high-ranking IPSO officials, met with **ACKAL** in his office. The agents told **ACKAL** that they had assaulted the two young men and **ACKAL** dismissed the significance of the assault by using racially derogatory language. The agents told **ACKAL** that they had provided the IPSO reporting officer a false account about conducting surveillance, and **ACKAL** instructed the officers to stick with that false story when they wrote their official statements regarding the incident.

    h.    **ACKAL** directed a high-ranking IPSO official to have the report, which named two Narcotics Agents as suspects in the assault, deleted.

13

i. At **ACKAL's** direction, the high-ranking IPSO official arranged to have the report removed from the IPSO reporting system.

j. Sometime in early 2009, **ACKAL** directed that all of IPSO's IA files were to be destroyed in order to prevent any of the files from becoming public.

k. An IPSO official, together with the high-ranking IPSO official, burned the IA files, including files that contained information related to allegations of excessive force by IPSO employees.

l. The high-ranking IPSO official also destroyed electronic IA files by destroying his computer hard drive.

m. In March 2009, **ACKAL** disbanded the IA Unit.

n. Sometime between 2009 and 2010, a suspect assaulted Narcotics Agent Bergeron during the course of a drug arrest. **SAVOY** responded to the scene after the suspect had been handcuffed and detained. **SAVOY** directed Bergeron to join him and the arrestee for a "ride." **SAVOY** then drove the arrestee away from the arrest site to a remote location where there were no witnesses.

o. **SAVOY** directed the arrestee, who was handcuffed behind his back, to exit the car and kneel on the ground. **SAVOY** took a bullet out of his gun, put it in the arrestee's mouth, and yelled at the arrestee for assaulting Bergeron. The arrestee began shaking and dropped the bullet out of his mouth. **SAVOY** then put his gun in the arrestee's mouth and threatened to kill him in retaliation for his prior misconduct.

p. On September 16, 2010, the Narcotics Unit tracked down R.R., who had, one month earlier, punched **SAVOY** in a bar in front of **SAVOY'S** wife, and whom **SAVOY** and **ACKAL** had directed the Narcotics Unit to arrest and charge with a drug offense. When R.R. fled, Agents Bergeron and Lassalle chased him, subdued him, and placed him under arrest. After arresting R.R., Bergeron and Lassalle assaulted him in retaliation for his prior assault on **SAVOY**.

q. After the assault at the arrest site, the agents took R.R. back to the Narcotics Office, handcuffed him, and shackled him to a bench. Narcotics Agent Bergeron and another narcotics agent then struck R.R. while he was restrained on the bench. When R.R.'s blood splattered on the wall, Agent Comeaux told R.R. to "lick the wall" to clean his blood off. **SAVOY**, who was present when the officers struck R.R., never intervened to stop the unlawful assault on or abuse of R.R.

r. Sometime after R.R.'s assault, a member of the Narcotics Unit reported to **ACKAL** that the Narcotics Unit had gotten R.R. back for what he had done to **SAVOY**. **ACKAL** never expressed disapproval over the assault on R.R. or disciplined any of the officers involved.

s. In October 2011, Agent Comeaux met with an IPSO official to prepare for a deposition in a lawsuit filed by A.D. (an inmate who had been beaten in the chapel of the IPJ in April 2011, as described in Counts 1 and 3 of the Second Superseding Indictment, and who had sued Narcotics Agents Wade Bergeron, Jason Comeaux and Ben Lassalle). At the meeting, Comeaux told the IPSO official that

15

the allegations in the lawsuit were true, in that the three officers had assaulted A.D. in the chapel of the jail; and the IPSO official told Comeaux to "fix [his] story."

t.  The IPSO official also told Comeaux not to repeat his admission to the attorney who had been retained to represent Comeaux and the other agents in the civil lawsuit.

u.  Following the meeting with the IPSO official, Comeaux met with Bergeron and Lassalle, who were also scheduled to give depositions, and relayed to them what the IPSO official had told him about "fixing" their stories. The agents then came up with a false story to provide in their depositions regarding A.D. The agents agreed to claim that they had not used any force on A.D. in the chapel in April 2011.

v.  During the depositions, in the presence of the IPSO official, all three agents lied, and denied having beaten A.D. in the chapel. After the depositions, the IPSO official told the officers they had "[done] good."

w.  In July 2014, Comeaux met with the IPSO official again, to prepare for a deposition in a lawsuit that had been filed by C.O. (another inmate who had been beaten in the chapel of the IPJ in April 2011, as described in Counts 1 and 2 of the Second Superseding Indictment, and who had sued Narcotics Agents Comeaux and Lassalle). At the meeting, Comeaux denied being involved in the beating of C.O., but told the IPSO official that he knew who had been involved; and the IPSO official told Comeaux to just say in the deposition that he had not beaten C.O., and to leave

16

out any names related to who had done the beating.

x. During the deposition, in the presence of the IPSO official, both Comeaux and Lassalle denied any involvement in, or knowledge of, C.O.'s beating in the chapel.

y. On March 14, 2014, **ACKAL**, after learning that a relative of his had allegedly been assaulted by R.T., convened a meeting at his office that included his injured relative, **SAVOY**, off-duty Narcotics Agents Lassalle and Hines, and another IPSO supervisor. **ACKAL** showed Lassalle and Hines his injured relative and told them to "take care of [R.T.]," who was allegedly responsible for the injuries. Lassalle and Hines understood, based on prior experience and prior conversations they had had, that **ACKAL** was instructing them to assault R.T. to retaliate against him for assaulting **ACKAL's** relative.

z. Following the meeting, Lassalle and Hines went to find, arrest, and assault R.T. When Lassalle and Hines located R.T., he complied with the officers' commands and was apprehended. While R.T. was compliant, pinned to the floor, and restrained, Hines kneed R.T. several times and struck him with his baton.

aa. Following the arrest and assault, Lassalle and Hines falsely claimed that R.T. had been injured during a justified use of force.

bb. During R.T.'s first week at the jail, **ACKAL** and **SAVOY** went to the IPJ and asked jail staff to bring R.T. to the administrative area of the jail. When jail staff brought R.T. to **ACKAL** and **SAVOY**, **SAVOY** told the jail staff to "get

17

lost." **SAVOY**, in the presence of **ACKAL**, then grabbed R.T., twisted his arm behind his back, and said "I ought to break your fucking arm like you did [**ACKAL**'s relative]." **ACKAL**, in the presence of **SAVOY**, yelled "You want to fuck with my family?"

All in violation of Title 18, United States Code, Section 371. [18 U.S.C. § 371].

## COUNT 5

## DEPRIVATION OF RIGHTS
## 18 U.S.C. § 242

On or about September 27, 2011, at the IPJ, in the Western District of Louisiana, defendants

### GERALD SAVOY and
### MARK FREDERICK,

while acting under color of law and while aiding and abetting each other and others known and unknown to the grand jury, willfully deprived E.M., a pre-trial detainee, of the right, protected and secured by the Constitution and laws of the United States, not to be deprived of liberty without due process of law, which includes the right to be free from excessive force amounting to punishment by a law enforcement officer. Specifically, **SAVOY, FREDERICK,** and other officers assaulted E.M. in the chapel of the IPJ. The offense resulted in bodily injury to E.M. and involved the use of a dangerous weapon (a baton).

All in violation of Title 18, United States Code, Sections 242 and 2. [18 U.S.C. §§ 242 and 2].

A TRUE BILL:

███████████████████
FOREPERSON OF THE GRAND JURY

STEPHANIE A. FINLEY
United States Attorney

*/s/ Joseph G. Jarzabek*
JOSEPH G. JARZABEK, La. Bar No. 07240
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone: (337) 262-6618


VANITA GUPTA
Principal Deputy Assistant Attorney General
United States Department of Justice
Civil Rights Division

*/s/ Mark Blumberg*
MARK BLUMBERG, Maryland Bar
Special Legal Counsel
United States Department of Justice
Civil Rights Division
601 D Street, N.W.
Washington, DC 20004
Telephone: (202) 305-2798

*/s/ Tona Boyd*
TONA BOYD, California Bar No. 270975
Trial Attorney
United States Department of Justice
Civil Rights Division
601 D Street, N.W.
Washington, DC 20004
Telephone: (202) 305-3666

20